**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FREDERICO QUAN, individually and
on behalf of all others similarly
situated; WALTER GRAY,
individually and on behalf of all
others similarly situated; DON
TYRONE BALLARD, individually and
on behalf of all others similarly
situated; JEANINE L. SHAMALY,
                    *Plaintiffs-Appellants,*

                    v.

COMPUTER SCIENCES CORPORATION;
CSC RETIREMENT AND EMPLOYEE
BENEFITS PLANS COMMITTEE; LEON
J. LEVEL; VAN B. HONEYCUTT;
IRVING W. BAILEY, II; F. WARREN
MCFARLAN; THOMAS H. PATRICK;
DONALD G. DEBUCK; HOWARD D.
FISK; MICHAEL E. KEANE; NATHAN
SIEKIERKA; FREDERICK F. VOLLRATH,
                    *Defendants-Appellees.*

No. 09-56190

D.C. No.
2:08-cv-02398-
SJO-JWJ

16665

FREDERICO QUAN, individually and
on behalf of all others similarly
situated; WALTER GRAY,
individually and on behalf of all
others similarly situated; DON
TYRONE BALLARD, individually and
on behalf of all others similarly
situated; JEANINE L. SHAMALY,
                    *Plaintiffs-Appellees,*

                    v.

COMPUTER SCIENCES CORPORATION;
CSC RETIREMENT AND EMPLOYEE
BENEFITS PLANS COMMITTEE; LEON
J. LEVEL; FREDERICK F. VOLLRATH;
DONALD G. DEBUCK; MICHAEL E.
KEANE; NATHAN SIEKIERKA; IRVING
W. BAILEY, II; F. WARREN
MCFARLAN; THOMAS H. PATRICK,
                    *Defendants-Appellants,*

                    and

VAN B. HONEYCUTT; HOWARD D.
FISK,
                    *Defendants.*

No. 09-56248

D.C. No.
2:08-cv-02398-
SJO-JWJ

OPINION

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
June 10, 2010—Pasadena, California

Filed September 30, 2010

Before: Alex Kozinski, Chief Judge, Johnnie B. Rawlinson, Circuit Judge, and Mark W. Bennett, District Judge.*

Opinion by Judge Bennett

*The Honorable Mark W. Bennett, District Judge for the Northern District of Iowa, sitting by designation.

## COUNSEL

Patrice L. Bishop, Stull, Stull & Brody, Los Angeles, California; Edwin J. Mills, Michael J. Klein, Stull, Stull & Brody,

New York, New York, for plaintiffs-appellants-cross-appellees.

Charles C. Jackson, Thomas F. Hurka, Christopher J. Boran, Morgan, Lewis & Bockius, L.L.P., Chicago, Illinois; Dean J. Kitchens, Gibson, Dunn & Crutcher, L.L.P., Los Angeles, California; Perrie M. Weiner, Edward D. Totino, Joshua Briones, DLA Piper, L.L.P., Los Angeles, California; Paul Blankenstein, Gibson, Dunn & Crutcher, L.L.P., Washington, D.C., for defendants-appellees-cross-appellants.

## OPINION

BENNETT, District Judge:

This is a class action pursuant to ERISA by participants in an employer's 401(k) plan against named and *de facto* fiduciaries of the plan. The participants appeal the district court's order granting the fiduciaries' summary judgment motion on the participants' claims that the fiduciaries 1) imprudently invested plan assets in the employer's stock; 2) negligently misrepresented and failed to disclose material information about the employer's finances and operations; and 3) failed to properly appoint, monitor, and inform the retirement plans committee and its members. The fiduciaries cross-appeal the district court's failure to award them costs as the prevailing parties in the litigation. We affirm the district court's grant of summary judgment and remand for findings regarding whether to award costs under Federal Rule of Civil Procedure 54(d). We also join the United States Courts of Appeals for the Third, Fifth, and Sixth Circuits by adopting the rebuttable "*Moench* presumption" that fiduciaries acted consistently with ERISA in their decisions to invest plan assets in employer stock. *See Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995); *see also In re Syncor ERISA Litig.*, 516 F.3d 1095, 1102 (9th Cir. 2008) (declining to adopt the *Moench* presumption).

## I.  BACKGROUND

### A.  Factual Background

This case involves a participant-directed 401(k) Matched Asset Plan (the Plan) offered by Computer Sciences Corporation (CSC) to certain of its employees. CSC is a multibillion dollar Fortune 500 information technology company with major operations in the United States and more than 60 other countries. Its revenue grew in every year but one between December 31, 1998, and January 23, 2008, the Class Period, and it was profitable in every year during that period. Its stock was and is heavily held by private and institutional investors, including public pension funds.

Participants in the Plan could contribute up to 50% of their salaries to their individual investment accounts. At regular intervals, the Plan gave participants full discretion to allocate and reallocate the voluntary contributions among fourteen diverse investment alternatives, which included a non-diversified fund holding CSC stock (the CSC Stock Fund). Under the Plan's governing document, the CSC Stock Fund was a mandatory investment offering designed to allow participants to "own part of the company for which [they] work." CSC then matched a part of these voluntary contributions with "matching contributions" equal to fifty cents for every dollar a participant contributed to his individual account, up to 3% of the participant's salary. Prior to January 2007, matching contributions were allocated to the CSC Stock Fund, and plan participants could only reallocate the contributions to other diversified funds in the Plan when they met certain age and service requirements.[1] Later, from January 2007

---

[1]The Plan provides for an individual account for each participant, making it an eligible individual account plan ("EIAP") under ERISA Section 407(d)(3). An EIAP is "(i) a profit-sharing, stock bonus, thrift, or savings plan; (ii) an employee stock ownership plan; or (iii) a money purchase plan which . . . invested primarily in qualifying employer securities." 29

onward, Plan participants could direct and reallocate "matching contributions" to any fund or funds in the Plan.

At times during the Class Period, the Plan held approximately ten million shares of CSC common stock. The CSC Retirement Plans Committee (the Committee), which consisted of CSC officers, was responsible for selecting Plan investment options. The Plan required that the CSC Stock Fund be one of the investment options.

Plaintiffs are a class of current and former employees of CSC and participants in the Plan (the Participants). Defendants are named and allegedly *de facto* fiduciaries of the Plan (the Fiduciaries), consisting of CSC, the Committee, and current and former officers and directors of CSC. The Participants' claims arise from alleged material weaknesses in CSC's stock option granting and tax accounting practices. The Participants allege that these material weaknesses caused over 9,000 errors in the pricing of stock options; deficiencies relating to accounting for income taxes; two restatements of CSC's financial statements within seven months; a one-day 12% drop in CSC's stock price; and an alleged loss of hundreds of millions of dollars in retirement savings to CSC employees and retirees.

CSC provided stock options as incentives to certain executives. The stock options purportedly had an exercise price equal to 100% of the market value on the option grant date. However, CSC followed a common practice for identifying the measurement date as the earliest date on which a company knows the option recipients, number of options to be issued,

U.S.C. § 1107(d)(3)(A). Because CSC's matching contributions were to the non-diversified CSC Stock Fund, the Plan is also an employee stock ownership plan ("ESOP") under ERISA Section 407(d)(6). An ESOP is a stock bonus plan "which is designed to invest primarily in qualifying employer securities." 29 U.S.C. § 1107(d)(6).

and the exercise price of the options. Thus, the stock option grant dates were actually changed between 5% and 10% of the time to adjust the market value of the stock options. On June 29, 2006, CSC announced that the Securities and Exchange Commission (SEC) had made an informal request for information about CSC's stock option granting practices. Other significant matters were also announced on June 29, 2006, including that CSC was no longer for sale and had decided to repurchase up to $2 billion of its common stock, amounting to about 19% of its outstanding shares. The following day, CSC's stock suffered a one-day drop of about 12% in value (from $55.88 to $48.56). The stock price quickly rebounded after the announcements, to $52.72 within a week, to $53.57 within two weeks, and to $61.79 approximately a year later.

In September 2006, the SEC's Office of the Chief Accountant issued new guidance on how the measurement date for stock options was to be determined, recognizing that there had been widespread confusion on that point. CSC established a special committee of directors to oversee an internal investigation into CSC's stock option granting practices. The investigation involved a law firm and an accounting firm, and cost more than $22 million. The special committee identified no intentional wrong-doing, but did identify necessary adjustments to CSC's pricing of 9,234 stock option grants. In addition, an independent audit had revealed tax deficiencies including accounting for income taxes, errors in income tax expenses and related liabilities, and errors in deferred tax assets. As a consequence of repricing its stock options and correcting its tax deficiencies, CSC restated its financial statements twice, on June 13, 2007, and on January 11, 2008.

The Participants allege that the Fiduciaries misrepresented CSC's accounting and income tax problems by stating that stock options were granted at 100% of the market value on the day of the grant; by filing financial statements with the SEC on Forms 10-Q and 10-K that later had to be restated in

2007 and 2008, after they had been incorporated into information to Plan participants about the CSC Stock Fund; and by stating that the June 2006 stock price drop was caused by "the market, not CSC." The Participants also assert that certain of the Fiduciaries breached their monitoring duties by failing to ensure that the Committee had access to information about CSC's business problems, which made CSC stock an imprudent retirement investment; and by failing to ensure that the monitored fiduciaries completely appreciated the huge risk of investing a significant amount of rank and file employees' retirement savings in CSC stock.

The Participants assert that the Fiduciaries' improper conduct caused class period damages to the Plan of over $700 million. The Fiduciaries concede that the total charge resulting from the 2007 and 2008 Restatements was a reduction of reported income for fiscal years 2005 to 2007 and retained earnings for fiscal year 2004 of $458.9 million, but they argue that those charges had no impact on the financial health of CSC, and were later largely offset by a settlement with the IRS concerning historic tax positions and accounting practices. The Fiduciaries also contend that the charges resulting from the stock option pricing errors amounted to only about $68 million in cumulative non-cash charges to CSC's earnings spread out over eleven fiscal years, which amounted to only about 1.4% of CSC's net income, and only about 0.1% of its revenues over the same period.

### B.   *Procedural Background*

This action pursuant to sections 409(a) and 502(a)(2) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1109(a) and 1132(a)(2), was transferred to the United States District Court for the Central District of California from the Eastern District of New York. The court certified a class of Participants on December 29, 2008,[2] and set trial for July 28, 2009.

---

[2]The class in question was defined as follows:

  [A]ll participants in the Plan for whose individual accounts the

Before trial, the parties filed cross-motions for summary judgment. The Participants sought summary judgment on their imprudent investment and misrepresentation claims, and the Fiduciaries sought summary judgment on all of Participants' claims. The district court issued an order denying the Participants' summary judgment motion, but granting the Fiduciaries' motion. The district court considered the Participants' imprudent investment claim under both the "*Moench* presumption," which the court noted that the Ninth Circuit has not yet adopted, and the prevailing "prudent man" standard of 29 U.S.C. § 1104(a)(1)(B). The district court concluded that the Participants had presented no evidence or argument that the Fiduciaries failed to use the care, skill, prudence, and diligence that a prudent man would use in the conduct of an enterprise of a like character and with like aims. In the alternative, the district court concluded that the Participants had presented no evidence or argument that a prudent investor under the circumstances would not have followed the plan's mandate to invest in employer securities, and thus failed to rebut the *Moench* presumption that the Fiduciaries acted consistently with ERISA in their decisions to invest Plan assets in CSC stock. The district court also concluded that the Participants had failed to establish or to create a triable issue as to losses from the allegedly imprudent investment. The district court granted summary judgment in favor of the Fiduciaries on the Participants' improper monitoring claim because the claim was derivative of the Participants' failed imprudent investment claim.

---

Plan held shares of the common stock of Computer Sciences Corporation as part of the Company Stock Fund or CSC Stock Fund investment option in the Plan, at any time between December 31, 1998, and January 23, 2008, inclusive (the "Class" and "Class Period, respectively.") Excluded from the Class are Defendants; members of the individual Defendants['] immediate families; and directors and/or senior officers of Computer Sciences Corporation; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors and assigns ("the Class").

As to the Participants' misrepresentation and nondisclosure claim, the district court first concluded that such a claim could be based on corporate documents and filings, if they were incorporated into Plan documents. Nevertheless, the district court found that the Participants had not generated any genuine issues of material fact that the alleged misrepresentations and nondisclosures at issue were material. The district court also found that the Participants had not generated genuine issues of material fact that they detrimentally relied on the alleged misrepresentations.

The district court's summary judgment order did not award costs. Nevertheless, the subsequent Judgment stated, without explanation, "The parties shall bear their own costs."

The Participants appeal the summary judgment ruling against them,[3] and the Fiduciaries cross-appeal the district court's failure to award them costs.

## II.    REVIEW OF SUMMARY JUDGMENT IN AN ERISA CASE

In ERISA cases, as in other cases, this court "review[s] de novo the district court's grant of summary judgment and, viewing the evidence in the light most favorable to the non-moving party, determine[s] whether there are any genuine issues of material fact for trial." *Syncor*, 516 F.3d at 1100. We "may affirm [summary judgment] on any ground supported by the record." *Alexander Mfg., Inc. Emp. Stock Ownership Plan & Trust v. Ill. Union Ins. Co.*, 560 F.3d 984, 986 (9th Cir. 2009); *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). For the reasons explained, the Participants fail to demonstrate that there are

---

[3]The Participants do not assert any issues on appeal relating to summary judgment in favor of the Fiduciaries on their improper monitoring claim.

genuine issues of material fact that make summary judgment improper.[4]

### III.   IMPRUDENT INVESTMENT

#### A.   The Statutory Standard

The statutory framework for breach-of-fiduciary-duty claims under ERISA, including imprudent investment claims, involves sections 404, 409, and 502 of ERISA, 29 U.S.C. §§ 1104, 1109, and 1132. *See generally Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1025 (9th Cir. 2009). Section 404(a)(1) of ERISA imposes a duty on Plan fiduciaries to invest Plan assets as a "prudent man" would do. 29 U.S.C. § 1104(a)(1).[5] Section 409 of ERISA imposes liability for breach of fiduciary duty, 29 U.S.C. § 1109(a), and section 502 provides, in pertinent part, that a civil action for breach of fiduciary duty may be brought "by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2).

---

[4]In their opening brief, the Participants listed one of the issues on appeal to be whether the district court erred in granting summary judgment in favor of the Fiduciaries "given [the Participants'] jury demand and their entitlement to trial by jury," but they offered no argument on this issue. They presented arguments on this issue for the first time in their reply brief. We deem an argument waived if it is raised for the first time only in a reply brief. *See, e.g., United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 n.1 (9th Cir. 2009). Additionally, an order granting summary judgment "does not deprive the losing party of its Seventh Amendment right to a jury trial." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1066 (9th Cir. 2009).

[5]The statute requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" and "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter." 29 U.S.C. § 1104(a)(1)(B), (D).

**[1]** Section 404(a)(1) requires a fiduciary to act prudently "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). However, section 404(a)(2) expressly exempts "acquisition or holding of qualifying employer real property or qualifying employer securities," in the case of an EIAP, like the Plan at issue here, from the obligation to diversify. 29 U.S.C. § 1104(a)(2). We have explained, "The plain language of 29 U.S.C. § 1104(a)(2) does not require fiduciaries of an eligible individual account plan to diversify their investment outside of company stock in order to meet the prudent man standard of care." *Syncor*, 516 F.3d at 1102; *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1094 (9th Cir. 2004). On the other hand, "29 U.S.C. § 1104(a)(2) does not exempt fiduciaries [for EIAPs] from the first prong of the prudent man standard, which requires a fiduciary to act with care, skill, prudence, and diligence in any investment the fiduciary chooses." *Syncor*, 516 F.3d at 1102; *Wright*, 360 F.3d at 1097. Thus, fiduciaries are required to act "prudently" when determining whether or not to invest, or continue to invest, ERISA plan assets in the plan participants' employer's stock. This is true, even though the duty of prudence may be in "tension" with Congress's expressed preference for plan investment in the employer's stock. *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 253 (5th Cir. 2008).

As we have explained, there are a "myriad of circumstances" that could violate the "prudent man" standard for investment of ERISA plan assets in a company's own stock. *Syncor*, 516 F.3d at 1102. Generally, "[a] court's task in evaluating a fiduciary's compliance with this standard is to inquire 'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.' " *Wright*, 360 F.3d at 1097 (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)).

### B.   The Moench Presumption

The Fiduciaries urge us to adopt the so-called "*Moench* presumption," first formulated by the Third Circuit in *Moench*, 62 F.3d at 571, for assessing whether fiduciaries imprudently invested in employer stock. The Participants point out that we have twice declined to adopt it and have even criticized it.

In *Moench*, the Third Circuit was confronted with the question, "To what extent may fiduciaries of [ESOPs] be held liable under [ERISA] for investing solely in employer common stock, when both Congress and the terms of the ESOP provide that the primary purpose of the plan is to invest in the employer's securities[?]" *Moench*, 62 F.3d at 556. The court concluded that "in limited circumstances, ESOP fiduciaries can be liable under ERISA for continuing to invest in employer stock according to the plan's direction." *Id.*

The plan at issue in *Moench* required the fiduciaries to invest "primarily" in the employer's stock.[6] Based on this language, the Third Circuit concluded that the plan "did not absolutely require the [fiduciaries] to invest exclusively in [the employer's] stock," so that the district court erred in holding that the fiduciaries had "no latitude but to continue investing in [the employer's] stock." *Id.* at 568.

**[2]** The fiduciaries in *Moench* argued that they nevertheless could not be liable under ERISA, because of the nature

---

[6]The Plan in this case stated that matching contributions "shall be" invested in the CSC Stock Fund, and that the "Trustee shall promptly invest" these contributions. However, the "trustee may defer investment of Matching Contributions . . . in such Stock for a reasonable period . . . if such action is deemed by it to be in the best interest of the Participants. The Trustee may sell any such Stock and defer reinvestment of the proceeds therefrom for a reasonable period . . . if such action is deemed by it to be in the best interests of the Participants." [ER 2468].

of the ESOP.[7] Therefore, the court turned to the standard of review for an ESOP fiduciary's decisions, and ultimately concluded that "the most logical result is that the fiduciary's decision to continue investing in employer securities should be reviewed for an abuse of discretion. . . . [A]n ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision." *Id.* at 571. The court went on to explain, in somewhat more detail, what a claimant would be required to show to rebut the presumption of prudent investment. *Moench*, 62 F.3d at 571-72. The Third Circuit has since elaborated on the scope and effect of the *Moench* presumption. *See In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231 (3d Cir. 2005); *Edgar v. Avaya, Inc.*, 503 F.3d 340 (3d Cir. 2007).

The Fifth and Sixth Circuits have expressly adopted the *Moench* presumption. *See Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995); *Kirschbaum*, 526 F.3d at 254-56. No federal appellate court has rejected the *Moench* presumption on its merits. *But see Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 10 (1st Cir. 2009) (declining to adopt a *Moench* presumption that retention of employer stock was reasonable in a case challenging the fiduciary's decision to *divest* the plan of the employer's stock, as doing so would controvert the purpose of the presumption and transform the intended shield into a sword to be used against a prudent fiduciary).

Until now, we have declined to adopt the *Moench* presumption. *See Syncor*, 516 F.3d at 1102; *Wright*, 360 F.3d at 1098 n.3. On the other hand, we have also declined to reject

---

[7]ESOPs are intended to reward and motivate employees by making them stakeholders in the success of the companies that employ them. Linking worker pay to company performance is thought to increase worker productivity and company loyalty, and for that reason "Congress . . . enacted a number of laws designed to encourage employers to set up such plans." *Donovan v. Cunningham*, 716 F.2d 1455, 1458 (5th Cir. 1983).

*Moench. Wright* did express reservations about the presumption:

> The Third Circuit's intermediate prudence standard is difficult to reconcile with ERISA's statutory text, which exempts EIAPs from the prudence requirement to the extent that it requires diversification. Interpreting ERISA's prudence requirement to subject EIAPs to an albeit tempered duty to diversify arguably threatens to eviscerate congressional intent and the guiding rationale behind EIAPs themselves.

*Wright*, 360 F.3d at 1097 (internal citations omitted). *Wright* also observed that "[t]he *Moench* standard seems problematic to the extent that it inadvertently encourages corporate officers to utilize inside information for the exclusive benefit of the corporation and its employees." *Id.* at 1098 n.4.

**[3]** We are not persuaded by either of the objections to the *Moench* presumption raised in *Wright*, that 1) the presumption conflicts with ERISA's diversification exemption, 29 U.S.C. § 1104(a)(2); and 2) the presumption encourages fiduciaries to engage in insider trading. We conclude that the *Moench* presumption is fully reconcilable with ERISA's statutory text and does not encourage insider trading, when properly formulated.

**[4]** First, the *Wright* court was concerned that the *Moench* presumption was at odds with ERISA's exemption of ESOPs and other EIAPs from its diversification requirements. " 'If there is no duty to diversify ESOP plan assets under the statute, it logically follows that there can be no claim for breach of fiduciary duty arising out of a failure to diversify, or in other words, arising out of allowing the plan to become heavily weighted in company stock' " *Wright,* 360 F.3d at 1097 (citing *In re McKesson HBOC, Inc. ERISA Litig.*, No. C00-20030RMW, 2002 WL 31431588, at *5 (N.D. Cal. Sept. 30, 2002) (unpublished disposition)). We were likely concerned

about this conflict between *Moench* and ERISA's text because *Moench* itself cites § 1104(a)(2) for the proposition that "under normal circumstances, ESOP fiduciaries cannot be taken to task for failing to diversify investments, regardless of how prudent diversification would be under the terms of an ordinary non-ESOP pension plan." *Moench*, 62 F.3d at 568. That is not the scenario in which the *Moench* presumption would do its work, however: "*Moench* . . . would not apply to allegations . . . which fairly state only a violation of the fiduciaries' duty to diversify. . . ." *Kirschbaum*, 526 F.3d at 254 n.8. We do not read the *Moench* presumption to apply to a "diversification" claim, because a presumption of prudence is unnecessary where fiduciaries are not subject to a prudence requirement to begin with. On the other hand, where employer stock is only one of the possible plan investments, and plaintiffs assert a claim that the fiduciary should have divested the plan of employer stock, the fiduciaries would be entitled to the presumption that investment in employer stock was prudent. Thus, the *Moench* presumption does not run afoul of the exemption from diversification in § 1104(a)(2).

**[5]** The *Wright* court's second concern was that "[t]he *Moench* standard seems problematic to the extent that it inadvertently encourages corporate officers to utilize inside information for the exclusive benefit of the corporation and its employees," which would "potentially run afoul of the federal securities laws." 360 F.3d at 1098 n.4. Quite the opposite is true: In contrast to ERISA's prudence requirement, *Moench* gives fiduciaries a safe harbor from failing to use insider information to divest from employer stock. In *Kirschbaum*, the Fifth Circuit noted that an objection to *tempering* the *Moench* presumption was that doing so would effectively require the fiduciary to trade on insider information. *Kirschbaum*, 526 F.3d at 256. We believe that if the burden to rebut the presumption of prudent investment is sufficiently heavy, plan fiduciaries will *not* be tempted to act on insider information to protect themselves from liability for decisions about continued investment in employer stock.

**[6]** We therefore adopt the *Moench* presumption. The presumption is consistent with the statutory language of ERISA and the trust principles by which ERISA is interpreted, whether the plan is an ESOP or other EIAP. *See Wright*, 360 F.3d at 1098 n.3. At its core, our objection to adopting the *Moench* presumption in *Wright* was that it was *not sufficiently* deferential to or protective of fiduciaries, not that it placed too great a burden on those asserting breach-of-fiduciary-duty claims. We believe that if properly formulated, the *Moench* presumption can strike the appropriate balance between the employee ownership purpose of ESOPs and other EIAPs, and ERISA's goal of ensuring proper management of such plans.

Plans that tie employee compensation to the company's success are widely believed to be good for employee productivity and loyalty: They "expand[ ] the national capital base among employees—an effective merger of the roles of capitalist and worker." *Moench*, 62 F.3d at 568 (citing *Donovan*, 716 F.2d at 1458). Congress has granted favored status to ESOPs and other EIAPs by exempting them from certain ERISA requirements. Congress has also expressed concern that "regulations and rulings which treat employee stock ownership plans as conventional retirement plans . . . block the establishment and success of these plans." *Id.* at 569 (citing Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1583, 1590).

We adopt the *Moench* presumption because it provides a substantial shield to fiduciaries when plan terms require or encourage the fiduciary to invest primarily in employer stock. Fiduciaries are not expected to predict the future of the company stock's performance; without the *Moench* presumption, a fiduciary "could be sued for not selling if he adhered to the plan [and the company stock dropped], but also sued for deviating from the plan [and selling] if the stock rebounded." *Kirschbaum*, 526 F.3d at 256. Moreover, the "long-term horizon of retirement investing" requires protecting fiduciaries from pressure to divest when the company's stock drops. *Id.*

at 254. The *Moench* presumption should also make it less likely that a plan fiduciary would be tempted to use insider information to divest the plan from company stock, since continued investment in the plan will be presumed prudent.

The presumption does not entirely insulate a fiduciary from a breach-of-fiduciary-duty claim because it may be rebutted by a showing that the fiduciary abused its discretion by investing in employer stock. *Moench* itself does not fully spell out what plan participants must show to rebut the presumption of prudent investment. The *Moench* court explained that the presumption would be rebutted if " 'owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust.' " *Moench*, 62 F.3d at 571 (quoting Restatement (Second) of Trusts § 227 cmt. g). We agree and add that if there is room for reasonable fiduciaries to disagree as to whether they are bound to divest from company stock, the abuse of discretion standard protects a fiduciary's choice not to divest. This will allow fiduciaries to "fulfill their duties in the safe harbor that Congress seems to have intended to provide them" for managing EIAPs and ESOPs. *In re Ford Motor Co. ERISA Litigation*, 590 F. Supp. 2d 883, 910 n.14 (E.D. Mich. 2008).

How bad do things have to be before no reasonable fiduciary in similar circumstances would have continued investing in company stock? A plaintiff in *Moench* pled the impending collapse of the company in order to overcome the presumption of prudent investment on a motion to dismiss. *Moench* determined the "precipitous decline" in company stock combined with an insider fiduciary's knowledge of the stock's "impending collapse" and the fiduciary's own "conflicted status" would constitute the type of change in circumstances that was not anticipated by the settlor of the trust. 62 F.3d at 571-72. Similarly, in *Wright*, we contemplated the need for dire circumstances before the presumption would be rebutted, observing that "[u]nlike *Moench*, this case does not present a

situation where a company's financial situation is seriously deteriorating and there is a genuine risk of insider self-dealing." 360 F.3d at 1098.

[7] To overcome the presumption of prudent investment, plaintiffs must therefore make allegations that "clearly implicate[ ] the company's viability as an ongoing concern" or show "a precipitous decline in the employer's stock . . . combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement." *Id.* at 1099 n.5; *Lalonde v. Textron, Inc.*, 270 F. Supp. 2d 272, 280 (D.R.I. 2003), *rev'd on different grounds in Lalonde v. Textron, Inc.*, 369 F.3d 1 (1st Cir. 2004). It will not be enough for plaintiffs to prove that the company's stock was not a "prudent" investment or that defendants ignored a decline in stock price. Plan participants can only rebut the *Moench* presumption by showing publicly known facts that would trigger the kind of "careful and impartial investigation" by a reasonable fiduciary that the plan's fiduciary failed to perform. *Moench*, 62 F.3d at 572 (internal quotation marks omitted).[8] In *Wright*,

---

[8]One premise of the Participants' imprudent investment claim is that the Fiduciaries should have acted on insider information to divest the plan of company stock, because such insider information was purportedly contrary to the company's public representations about the company's financial practices and financial health. However, throughout the Class Period, CSC did not encounter problems grave enough to rebut the *Moench* presumption, so that we need not address this claim. We do note, however, that fiduciaries are under no obligation to violate securities laws in order to satisfy their ERISA fiduciary duties. Restatement (Second) Trusts § 166, cmt. a ("The trustee is not under a duty to the beneficiary to do an act which is criminal or tortious."). Moreover, plan participants are not entitled to profit from artificially inflated stock prices or to avoid financial loss by selling before public disclosure of a company's deteriorating health. If material information about a company's precarious financial status is made public, and plan fiduciaries did not divest before the plan participants could make a profit or reduce a substantial loss, "the damage to the plan participants would not be the fault of the plan fiduciary but of . . . the corporate officials who [concealed misconduct], and against whom the plan would have a cause of action." *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 565 (S.D. Tex. 2003). We do not construe an ERISA fiduciary's duties of loyalty and prudence to include violating the law to serve a plan's beneficiaries. *See also In re McKesson HBOC*, 2002 WL 31431588, at *6-*7.

we said that, under ERISA's prudence requirement, the court's task "is to inquire 'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.' " 360 F.3d at 1097 (quoting *Donovan*, 716 F.2d at 1232). In contrast, under the *Moench* presumption, a fiduciary's decision not to divest, when faced with "[m]ere stock fluctuations, even those that trend downward significantly," does not give rise to the inference that the fiduciary did not properly investigate the merits of continued investment in employer stock. *Wright*, 360 F.3d at 1099.

**[8]** There is no bright-line rule as to how much evidence is needed to rebut the *Moench* presumption because Congress has not chosen to create one: "[T]he statutory standard itself —'prudence'—has no tidy limiting principle. . . . In this matter as in many others, fiduciaries and courts alike must rely on common sense and experience to supplement airtight logic." *In re Ford Motor Co.*, 590 F. Supp. 2d at 892. A guiding principle, however, is that the burden to rebut the presumption varies directly with the strength of a plan's requirement that fiduciaries invest in employer stock. For a directed trustee, there is "a lesser degree of judicial scrutiny," while the more discretion a fiduciary has to invest in "less-risky holdings as necessary," the more his decisions will be subject to judicial scrutiny. *Kirschbaum*, 526 F.3d at 255 & n.9. In any event, however, the *Moench* presumption would be difficult to rebut. *See id.* at 256 n.12 (citing cases with facts insufficient to rebut the *Moench* presumption, including an "ill-fated merger, reverse stock split, and seventy-five percent drop in stock price," "company-wide financial woes and eighty percent drop in stock price" and "widespread accounting violations, restated revenues for three years, and seventy-five percent drop in stock price").

## C. *The Imprudent Investment Claim*

**[9]** The Participants assert that investment of the Plan's assets in CSC stock was imprudent, because of material weak-

nesses in both CSC's stock option granting program and CSC's accounting for income taxes. The *Moench* presumption applies to this claim of breach of fiduciary duty by an EIAP fiduciary for offering employer stock in the plan and failing to divest the plan of the employer's stock. The *Moench* presumption applies even if, prior to January 2007, the Fiduciaries were not only required to offer employer stock as an investment option, but also required to invest "matching contributions" in employer stock. We note that the Participants did not show that the Committee had discretion to halt purchases of CSC's common stock or to invest Plan assets that were required to be invested in the CSC stock fund in other assets instead. The question is whether the district court correctly found that the Participants did not generate any genuine issues of material fact that the Fiduciaries nevertheless should have stopped Plan investments in CSC stock. *See Kirschbaum*, 526 F.3d at 253; *Syncor*, 516 F.3d at 1102 (the claimant must show that "a prudent investor under the circumstances would not have followed the plan's mandate to invest in employer securities").

The Participants contend that the district court erred in granting summary judgment in favor of the Fiduciaries on their imprudence claim, because the record is "rich" with evidence that it was imprudent for the Fiduciaries to hold or offer CSC stock in the Plan. We agree with the district court, however, that the Participants did not generate a genuine issue of material fact sufficient to rebut the *Moench* presumption that continued investment in CSC stock was prudent.

**[10]** Even assuming that the Fiduciaries were aware of problems with the stock option granting practices and income tax accounting—and contrary to the Participants' assertions, the record giving rise to inferences that the Fiduciaries would have known of these problems is rather scant—"[o]ne cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from [Plan] provisions." *Kirschbaum*, 526

F.3d at 256. "Instead . . . there ought to be persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest." *Id.* The Participants here have presented no evidence that it was unreasonable for the Fiduciaries to believe that CSC would overcome its problems with stock options pricing and income tax accounting, especially in light of CSC's internal investigations of those problems. Thus, the Participants' evidence is insufficient to rebut the *Moench* presumption of prudence.

[11] Nor do the Participants point to evidence that would generate a genuine issue of material fact that, at the time that the Fiduciaries continued to hold CSC common stock as part of the Plan's investment, the Fiduciaries failed to employ appropriate methods to investigate the merits of the investment and to structure the investment. *Wright*, 360 F.3d at 1097; *see also Moench*, 62 F.3d at 572. First, "[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the *Moench* presumption." *Wright*, 360 F.3d at 1099. Thus, the district court properly found that the decline in CSC's stock price did not give rise to an inference that the Fiduciaries did not properly investigate the merits of continued investment in CSC stock.

[12] Second, contrary to the Participants' contentions, the district court did not engage in a "faulty analysis" by considering that the Fiduciaries might also have been sued if they had stopped offering CSC stock. Courts applying the *Moench* presumption have recognized that this very principle applies, not only where fiduciaries allegedly fail to maximize returns, but also where they allegedly held employer stock imprudently. *See Moench*, 62 F.3d at 571-72; *see also Kirschbaum*, 526 F.3d at 256. Moreover, the Participants' argument against considering whether the fiduciary might also be sued for divesting improperly relies on the hindsight conclusion that the fiduciary acted imprudently by holding the company stock

in the first place. *See DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007) ("[W]hether a fiduciary's actions are prudent cannot be measured in hindsight, whether this hindsight would accrue to the fiduciary's detriment or benefit.").

**[13]** Third, the district court properly rejected the Participants' claim that the one-day drop in CSC's stock price in late June 2006 was sufficient to show that the Fiduciaries did not properly investigate their continued investment in CSC stock. It is true that "[a] violation may occur where a company's stock did not trend downward over time, but was artificially inflated during that time *by an illegal scheme* about which the fiduciaries knew or should have known, and then suddenly declined when the scheme was exposed." *Syncor*, 516 F.3d at 1102 (emphasis added). However, the Participants did not argue below, and do not argue on appeal, that any alleged problems in the handling of stock options, which purportedly caused the one-day drop in CSC's stock price, amounted to an "illegal scheme." That one-day drop also does not generate a genuine issue of material fact as to imprudence of continued investment in CSC stock on the basis of allegations of wrongdoing short of illegal conduct, where the price of the stock rebounded to more than its trading price within a reasonably short time frame. *See Edgar*, 503 F.3d at 349 n.13.

**[14]** Fourth, equally unavailing is the Participants' assertion that the Fiduciaries' knowledge of problems with CSC's stock option granting practices and accounting for income taxes shows that the Fiduciaries failed to evaluate the merits of continued investment in company stock. Courts have held that a duty to investigate whether continued investment in company stock is prudent "only arises when there is some reason to suspect that investing in company stock may be imprudent—that is, there must be something akin to a 'red flag' of misconduct." *Pugh v. Tribune Co.*, 521 F.3d 686, 700 (7th Cir. 2008) (citing *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 & n.4 (9th Cir. 1995)).[9] The Participants

---

[9]In *Barker*, we observed, "Not to investigate suspicions that one has with respect to the funding and maintenance of the plan constitutes a breach of [fiduciary] duty." *Barker*, 64 F.3d at 1403.

alleged that the fiduciaries ignored "red flags," but CSC responded to the "red flag" issues by appropriately investigating and addressing the alleged problems. The Fiduciaries did not breach their duty by failing to divest the Plan of company stock. *See id.*

**[15]** Finally, to generate genuine issues of material fact on an imprudent investment claim, the Participants " 'must show a *causal link* between the failure to investigate [or divest] and the harm suffered by the plan.' " *Wright*, 360 F.3d at 1099. They have not done so. The evidence they present does nothing to distinguish the causal effect on the stock price, if any, of the announcement of the SEC's request for information about CSC's stock option granting practices from the causal effect of the announcement of other significant matters that same day, including the fact that CSC was no longer looking for a buyer and would buy back a substantial amount of its stock.[10] The record is also devoid of evidence that CSC's repricing its stock options, after its internal investigation and after the SEC's clarification of the guidelines for stock option pricing, was out of step with adjustments that other companies were forced to make in light of the SEC's clarification.

**[16]** Upon *de novo* review, we affirm the district court's grant of summary judgment to the Fiduciaries on the Participants' imprudent investment claim.

---

[10]The Participants also fault the district court for not considering the report of one of their experts, Mr. Miller, which purportedly calculated huge losses to the Plan. Mr. Miller's "report" was actually an affidavit, and as the district court noted, his only example of loss from allegedly imprudent conduct was the one-day drop in CSC's stock price on June 30, 2006. *See* Miller's Report, ¶ 7. Because neither the one-day drop, nor any of the other alleged problems, were sufficient to make investment in CSC stock imprudent, Mr. Miller did not show a causal link between imprudent investment and losses to the Plan.

## IV.   THE MISREPRESENTATION CLAIM

**[17]** The Participants assert that the Fiduciaries concealed and negligently misrepresented the truth about CSC's accounting and income tax problems. We have recognized "[ERISA] fiduciaries breach their duties if they mislead plan participants or misrepresent the terms or administration of a plan. . . . A fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information." *Barker*, 64 F.3d at 1403 (internal citations omitted). "[T]he same duty applies to 'alleged material misrepresentations made by fiduciaries to participants regarding the risks attendant to fund investment.' " *Edgar*, 503 F.3d at 350.

**[18]** As the Third Circuit has explained, " 'a misrepresentation is 'material' if there was a substantial likelihood that it would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies' in a particular fund." *Id.* This definition of "materiality" is consonant with this court's formulations of "materiality" in other ERISA contexts. *See Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 504 F.3d 818, 823-24 (9th Cir. 2007) (ERISA disability benefits case); *Thomas, Head & Greisen Emps. Trust v. Buster*, 24 F.3d 1114, 1121 (9th Cir. 1994) (action by an ERISA trust against the seller of deed of trust notes). The definition applies here, too.

The Participants' misrepresentation claim is premised on 1) a statement purportedly to the effect that the June 2006 stock price drop was caused by "the market, not CSC"; 2) statements that stock options have an exercise price equal to 100% of the market value on the day they were granted; and 3) financial statements filed with the SEC on Forms 10-Q and 10-K that were incorporated into information to Plan participants about the CSC Stock Fund. We assume, without deciding, that alleged misrepresentations in SEC disclosures that

were incorporated into communications about an ERISA plan are "fiduciary communications" on which an ERISA misrepresentation claim can be based. Even with this assumption, the district court's order granting summary judgment in favor of the Fiduciaries on the Participants' misrepresentation claim must be affirmed because the Participants failed to generate genuine issues of material fact that each of the communications in question was a misrepresentation that was material.

**[19]** First, and easiest to dispose of, is the Participants' contention that the Fiduciaries made a material misrepresentation in the CSC newsletter entitled "Solutions" that "it was the market, not CSC" that caused the significant late-June 2006 market decline. As the district court correctly found, this statement could not possibly be a misrepresentation about the cause of the late-June 2006 market decline, because the statement was actually made based on information known to the commentator for the period *ending June 15, 2006.* The Participants ignore this fact, or attempt to direct the court's attention away from it, by concentrating their appeal on the district court's determination that the statement was not made by the Fiduciaries, but by a third party. Even supposing that the statement was adopted by the Fiduciaries, it still is not a misrepresentation about the cause of the stock drop on June 30, 2006.

Second, the Participants contend that the Fiduciaries made material misrepresentations in statements about pricing of stock options at 100% of market value at the time they were granted. Those statements may have been untrue in light of the post-hoc clarification of the standard for pricing of stock options in the SEC guidance in September 2006. Nevertheless, it is not clear that anything in the record generates a genuine issue of material fact that the statements were untrue prior to that guidance. Also, even assuming that they were untrue when made, the Participants did not generate any genuine issues of material fact that the statements were "material," in the sense that there was a substantial likelihood that they

would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in the CSC stock fund. *Edgar*, 503 F.3d at 350. The stock options pricing errors amounted to only about $68 million in charges over eleven fiscal years, only about 1.4% of CSC's net income, and only about 0.1% of its revenues over the same period. The Participants attempt to direct the court's attention only to the charges from repricing of stock options in the aggregate, and at the percentage error in relation only to stock option pricing claimed in particular years. Doing so, however, does not generate a genuine issue of material fact that the allegedly erroneous statements about the stock options pricing were material to CSC's financial condition as a whole or material to decisions about investment in CSC stock.

The Participants assert that *United States v. Reyes*, 577 F.3d 1069, 1076 (9th Cir. 2009), stands for the broad proposition that improper accounting of backdated stock options is necessarily a material misstatement. We disagree. *Reyes* is about criminal backdating but recognizes that "backdating" is not itself illegal if properly recorded. *Reyes*, 577 F.3d at 1073. The *Reyes* decision also states the same test of materiality as *Edgar*, whether there is " 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the "total mix" of information made available.' " *Id.* at 1075 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). We concluded, above, that information about the pricing of stock options was not material under this standard.

**[20]** Thus, as the district court concluded, it was highly unlikely that a reasonable participant would have been misled in making an adequately informed decision about whether to place or maintain monies in the CSC stock fund by statements about the pricing of stock options later shown to be arguably inaccurate. *Edgar*, 503 F.3d at 350. Because the Participants failed to generate any genuine issue of material fact that the

Fiduciaries made "material" misstatements or nondisclosures, the district court properly granted summary judgment on their misrepresentation claim.

## V.   THE FIDUCIARIES' COSTS

**[21]** The Fiduciaries cross-appeal the district court's failure to award them costs as "prevailing parties" pursuant to Rule 54 of the Federal Rules of Civil Procedure. Although the district court's summary judgment ruling was silent on the matter, the subsequent Judgment stated, without explanation, "The parties shall bear their own costs." Rule 54 provides that "*[u]nless a federal statute, these rules, or a court order provides otherwise*, costs—other than attorney's fees—should be allowed *to the prevailing party*." Fed. R. Civ. P. 54(d)(1) (emphasis added). ERISA § 502(g)(1) also provides for an award of costs: "In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action *to either party*." 29 U.S.C. § 1132(g)(1) (emphasis added).

**[22]** This court has not resolved the question of whether Rule 54(d)(1) is supplanted or supplemented by 29 U.S.C. § 1132(g)(1), nor has any other circuit court. *But see Agredano v. Mutual of Omaha Cos.*, 75 F.3d 541, 543-44 (9th Cir. 1996) (using Rule 54(d)(1) to assist in the interpretation of allowable costs under § 1132); *Leonard v. Sw. Bell Corp. Disability Income Plan*, 408 F.3d 528, 532-33 (8th Cir. 2005) (considering whether an award of costs was appropriate pursuant to Rule 54(d)(1) in an ERISA case otherwise brought pursuant to 29 U.S.C. § 1132). Federal district courts to consider the question appear to be split. *Compare Brieger v. Tellabs, Inc.*, 652 F. Supp. 2d 925, 926-27 (N.D. Ill. 2009) (awarding costs under § 1132(g)(1) because it "provide[s] otherwise" within the plain language of Rule 54(d)(1)), *with MacLeod v. Procter & Gamble Disability Ben. Plan*, 460 F. Supp. 2d 340, 350-51 (D. Conn. 2006) (awarding costs under

rule 54(d)(1) while recognizing that § 1132(g) allows an award of costs to either party, not just to a prevailing party).

**[23]** We hold § 1132(g)(1) does not plainly "provide otherwise" than Rule 54(d)(1) for the award of costs to a prevailing party. To "provide otherwise" than Rule 54(d)(1), the statute or rule would have to *bar* an award of costs to a prevailing party. Section 1132(g)(1), however, in no way *precludes* an award of costs to a prevailing party; it simply provides that, in any action by a plan participant pursuant to ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action *to either party*." 29 U.S.C. § 1132(g)(1) (emphasis added). Thus, § 1132(g)(1) may apply to the award of costs where Rule 54(d)(1) does not, but it does not necessarily preclude an award of costs pursuant to Rule 54(d)(1) or make an award of costs pursuant to Rule 54(d)(1) superfluous. Rule 54(d)(1) applies here to determine whether the prevailing Fiduciaries were entitled to an award of costs.

Although Rule 54(d)(1) does "create[ ] a presumption for awarding costs to prevailing parties," it also places on the losing party the burden to "show why costs should not be awarded." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 944-45 (9th Cir. 2003); *see also Dawson v. City of Seattle*, 435 F.3d 1054, 1070 (9th Cir. 2006). In *Save Our Valley*, this court held that the district court must "specify reasons" only when it *refuses* to tax costs:

> [A] district court need not give affirmative reasons for awarding costs; instead, it need only find that the reasons for denying costs are not sufficiently persuasive to overcome the presumption in favor of an award. The presumption itself provides all the reason a court needs for awarding costs, and when a district court states no reason for awarding costs, we will assume it acted based on that presumption.

*Save Our Valley*, 335 F.3d at 945; *Ass'n of Mex.-Am. Educators v. State of California*, 231 F.3d 572, 591-92 (9th Cir.

2000). Proper grounds for denying costs include "(1) a losing party's limited financial resources; (2) misconduct by the prevailing party; and (3) 'the chilling effect of imposing . . . high costs on future civil rights litigants,' " as well as 4) whether "the issues in the case were close and difficult"; 5) whether "the prevailing party's recovery was nominal or partial"; 6) whether "the losing party litigated in good faith"; and 7) whether "the case presented a landmark issue of national importance." *Champion Produce, Inc. v. Ruby Robinson Co., Inc.*, 342 F.3d 1016, 1022 (9th Cir. 2003).

**[24]** Here, the district court stated no reasons for failing to award the Fiduciaries their costs as the prevailing parties. That omission was contrary to established law of this Circuit. Because the district court retains the discretion to deny an award of costs to a prevailing party under Rule 54(d)(1), the proper remedy is to reverse the portion of the Judgment requiring each party to bear its own costs, and to remand to the district court the limited question of whether or not to award costs to the Fiduciaries pursuant to Rule 54(d)(1) in light of the facts presented.

## VI.    CONCLUSION

Upon *de novo* review, we conclude that the district court properly granted summary judgment to the Fiduciaries on the Participants' imprudent investment and misrepresentation claims. The Participants did not challenge on appeal the district court's grant of summary judgment to the Fiduciaries on the Participants' monitoring claim. Therefore, the district court's Order granting summary judgment to the Fiduciaries on all claims is affirmed.

On the Fiduciaries' cross-appeal, we conclude that the district court failed to explain why an award of costs pursuant to Rule 54(d)(1) should be denied, where the Fiduciaries are the prevailing parties. Therefore, the portion of the Judgment requiring each party to bear its own costs is reversed, and this

matter is remanded for the limited purpose of determining whether or not costs should be awarded to the Fiduciaries pursuant to Rule 54(d)(1).

AFFIRMED as to the Participants' appeal, and REVERSED AND REMANDED as to the Fiduciaries' cross-appeal.