**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STEVE HARRIS; DENNIS F. RAMOS, AKA Dennis Ramos; DONALD HANKS; JORGE TORRES; ALBERT CAPPA, On Behalf of Themselves and All Others Similarly Situated,
*Plaintiffs-Appellants*,

v.

AMGEN, INC.; AMGEN MANUFACTURING, LIMITED; FRANK J. BIONDI, JR.; JERRY D. CHOATE; FRANK C. HERRINGER; GILBERT S. OMENN; DAVID BALTIMORE; JUDITH C. PELHAM; KEVIN W. SHARER; FREDERICK W. GLUCK; LEONARD D. SCHAEFFER; CHARLES BELL; JACQUELINE ALLRED; AMGEN PLAN FIDUCIARY COMMITTEE; RAUL CERMENO; JACKIE CROUSE; FIDUCIARY COMMITTEE OF THE AMGEN MANUFACTURING LIMITED PLAN; LORI JOHNSTON; MICHAEL KELLY,
*Defendants-Appellees*,

DENNIS M. FENTON; RICHARD NANULA; THE FIDUCIARY COMMITTEE; AMGEN GLOBAL

No. 10-56014

D.C. No.
2:07-cv-05442-PSG-PLA

ORDER AND OPINION

BENEFITS COMMITTEE; AMGEN
FIDUCIARY COMMITTEE,
                                    *Defendants*.

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted
February 17, 2012—Pasadena, California

Filed October 23, 2013

Before: Jerome Farris and William A. Fletcher, Circuit
Judges, and Edward R. Korman, Senior District Judge.[*]

Order;
Opinion by Judge W. Fletcher

---

[*] The Honorable Edward R. Korman, Senior United States District Judge
for the Eastern District of New York, sitting by designation.

# SUMMARY[**]

## ERISA

The panel filed an order denying petitions for rehearing and rehearing en banc, withdrawing its opinion filed June 4, 2013, and issuing a new opinion in an appeal from the dismissal of a class action under ERISA.

In the new opinion, the panel reversed the dismissal of an ERISA class action brought by current and former employees of Amgen, Inc., and an Amgen subsidiary. The panel held that a presumption of prudence did not apply and that, in the absence of the presumption, the plaintiffs sufficiently alleged violation of defendants' fiduciary duties regarding two employer-sponsored pension plans. The panel also held that Amgen was an adequately alleged fiduciary of the Amgen Plan.

## COUNSEL

Stephen J. Fearon, Jr. and Garry T. Stevens, Jr., Squitieri & Fearon, LLP, New York, New York; Stephen M. Fishback and Daniel L. Keller, Keller, Fishback & Jackson, LLP, Tarzana, California; Francis M. Gregorek, Betsy C. Manifold, and Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz, LLP, San Diego, California, Mark C. Rifkin (argued), Wolf Haldenstein Adler Freeman & Herz, LLP, New York,

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

New York; and Thomas James McKenna, Gainey & McKenna, New York, New York, for Appellants.

Emily Seymour Costin, Sheppard Mullin Richter & Hampton, LLP, Washington, D.C.; Steven Oliver Kramer and Jonathan David Moss, Sheppard Mullin Richter & Hampton, LLP, Los Angeles, California; Jonathan Rose, Alston & Bird, LLP, Washington, D.C.; John Nadolenco, Mayer Brown, LLP, Los Angeles, California; Brian David Netter, Mayer Brown, LLP, Washington, D.C.; and Robert P. Davis (argued), Mayer Brown, LLP, New York, New York, for Appellees.

### ORDER

The opinion filed on June 4, 2013, and published at 717 F.3d 1042 (9th Cir. 2013), is withdrawn and replaced by the attached opinion.

With the filing of the new opinion, the panel has voted unanimously to deny the petition for rehearing. Judge Fletcher has voted to deny the petition for rehearing en banc, and Judges Farris and Korman so recommend.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc, filed June 18, 2013, are **DENIED**.

**OPINION**

W. FLETCHER, Circuit Judge:

Plaintiffs, current and former employees of Amgen, Inc. ("Amgen") and its subsidiary Amgen Manufacturing, Limited ("AML"), participated in two employer-sponsored pension plans, the Amgen Retirement and Savings Plan (the "Amgen Plan") and the Retirement and Savings Plan for Amgen Manufacturing, Limited (the "AML Plan") (collectively, "the Plans"). The Plans were employee stock-ownership plans that qualified as "eligible individual account plans" ("EIAPs") under 29 U.S.C. § 1107(d)(3)(A). All of the plaintiffs' EIAPs included holdings in the Amgen Common Stock Fund, one of the investments available to plan participants. The Amgen Common Stock Fund held only Amgen common stock.

After the value of Amgen common stock fell, plaintiffs filed an ERISA class action against Amgen, AML, Amgen's board of directors, and the Fiduciary Committees of the Plans (collectively, "defendants"), alleging that defendants breached their fiduciary duties under ERISA. The district court dismissed Amgen as a defendant from the suit on the ground that it was not a fiduciary. It dismissed the complaint against the other defendants, who were fiduciaries, after applying the "presumption of prudence" articulated in *Quan v. Computer Sciences Corp.*, 623 F.3d 870 (9th Cir. 2010). Alternatively, even assuming the absence of the presumption, it dismissed on the ground that defendants did not violate their fiduciary duties.

We reverse. We conclude that the presumption of prudence does not apply, and that, in the absence of the

presumption, plaintiffs have sufficiently alleged violation of the defendants' fiduciary duties. We further conclude that Amgen is an adequately alleged fiduciary of the Amgen Plan.

## I. Background

The following narrative is taken from the complaint and documents that provide uncontested facts. On a motion to dismiss, we assume the allegations of the complaint to be true. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Amgen is a global biotechnology company that develops and markets pharmaceutical drugs. AML, a wholly owned subsidiary of Amgen, operates a manufacturing facility in Puerto Rico. To provide retirement benefits to their employees, Amgen set up the Amgen Plan on April 1, 1985. AML set up the AML Plan in 2002 and it became effective on January 1, 2006.

The Plans are covered by the Employee Retirement Income Security Act ("ERISA"). Both qualify as "individual account plans." *See* 29 U.S.C. § 1002(34). Plan participants contribute a portion of their pre-tax compensation to individual investment accounts. They receive benefits based solely upon their contributions, adjusted for any gains and losses in assets held by the Plans. Participants may contribute up to thirty percent of their pre-tax compensation. They may select from a number of investment funds offered by the Plans. One of those is the Amgen Common Stock Fund, which holds only Amgen stock. Amgen stock constituted the largest single asset of both Plans in 2004 and 2005.

This litigation arises out of a controversy concerning Amgen drugs used for the treatment of anemia. Anemia is a condition in which blood is deficient in red blood cells or hemoglobin. Causes of anemia include an iron-deficient diet, excessive bleeding, certain cancers and cancer treatments, and kidney or liver failure. In the early 1980s, Amgen scientists discovered how to make artificial erythropoietin, a protein formed in the kidneys that stimulates erythropoiesis, the formation of red blood cells. After this discovery, Amgen commercialized the manufacture of a class of drugs known as erythropoiesis-stimulating agents ("ESAs") to treat anemia.

In 1989, the Federal Drug Administration ("FDA") approved Amgen's first commercial ESA, epoetin alfa, for the treatment of anemia associated with chronic kidney failure. Amgen marketed epoetin alfa for approved uses under the brand name EPOGEN ("Epogen"), and licensed patents to Johnson & Johnson ("J&J") to develop additional marketable uses. J&J obtained FDA approval between 1991 and 1996 to market epoetin alfa under the brand name PROCRIT ("Procrit") for anemia associated with chemotherapy and HIV therapies, for chronic kidney diseases, and for pre-surgery support of anemic patients. J&J had exclusive marketing rights for Procrit under its licensing agreement with Amgen.

Sometime before 2001, Amgen developed a new ESA, darbepoetin alfa, whose sales by Amgen were not restricted by J&J's exclusive marketing rights for Procrit. Darbepoetin alfa, marketed as Aranesp, lasts longer in the bloodstream than epoetin alfa. The FDA approved Aranesp for treatment of anemia associated with chronic kidney failure and cancer chemotherapy. Aranesp has taken significant market share from J&J's Procrit. At the time the complaint was filed,

Aranesp "control[led] half the market" for non-dialysis ESA. Sales of EPOGEN and Aranesp have been "core to [Amgen's] survival and success," making up roughly half of Amgen's $14.3 billion in revenue in 2006.

In the late 1990s and early 2000s, several clinical trials raised safety concerns regarding the use of ESAs for particular anemic populations. In 1998, the Normal Hematocrit Study tested the efficacy of ESAs on anemia patients with pre-existing heart disease. The study was terminated because the test group experienced statistically significant higher rates of blood clotting. In 2003 and early 2004, two trials — ENHANCE and BEST — tested ESAs on cancer patients in Europe. The ENHANCE trial showed shorter progression-free survival and shorter overall survival of head and neck cancer patients for the ESA group than the placebo group. The BEST trial was terminated after four months because breast cancer patients in the group taking epoetin alfa had a higher rate of death than those in the placebo group.

ENHANCE and BEST did not test the safety of ESAs for the specific uses and doses for which they had been approved in the United States. In March 2004, the FDA published notice in the Federal Register that the Oncology Drug Advisory Committee ("ODAC"), an FDA-sponsored group of oncology experts, would convene in May 2004 to discuss safety concerns about Aranesp. In April, before the ODAC meeting, an Amgen spokesperson stated during a conference call with investors, analysts, and plan participants that "the focus [of the ODAC meeting] was not on Aranesp" and that "the safety for Aranesp has been comparable to placebo."

During its two-day meeting with ODAC, the FDA urged Amgen to conduct further clinical trials to test the safety of ESAs for uses that had already been approved by the FDA. Amgen made a presentation at the meeting outlining what it called the "Amgen Pharmacovigilance Program," consisting of five ongoing or planned clinical trials testing Aranesp "in different tumor treatment settings." Amgen's Vice President for Oncology Clinical Development described the Amgen program as the "responsible and credible approach to definitively resolv[e] the questions raise[d]" by the FDA.

One of the trials under Amgen's program was the Danish Head and Neck Cancer Group (DAHANCA) 10 Trial. The DAHANCA 10 Trial tested whether high doses of Aranesp could help shrink tumors in patients receiving radiation therapy for head and neck cancer. On October 18, 2006, DAHANCA investigators temporarily halted the study "due to information about potential unexpected negative effects." Amgen was informed of the temporary halt of the study on or near that day. Amgen did not disclose that the DAHANCA 10 Trial had been temporarily halted.

An analysis of the halted DAHANCA 10 Trial was completed on November 28, 2006. The principal investigator reported that "[b]ased on these outcome results the DAHANCA group concluded that the likelihood of a reverse outcome, i.e. that Aranesp would be significantly better than in control[,] was almost non-existing." The DAHANCA 10 Trial was permanently terminated on December 1, 2006. DAHANCA investigators concluded that "there is a small but significant poor outcome in the patients treated with Aranesp" in that tumor growth was worse for patients who took Aranesp compared to patients who did not. Amgen was

informed in December 2006 that the study had been permanently terminated.

Another clinical trial, CHOIR, raised additional safety concerns about ESAs.  The CHOIR trial investigated the safety of epoetin alfa (EPOGEN) when used to treat chronic kidney disease patients.  The safety monitoring board for CHOIR terminated the trial when a higher incidence of death and cardiovascular hospitalization was observed among epoetin alfa users.  Yet another clinical trial, CREATE, tested the benefit provided by Roche Pharmaceuticals's ESA in raising hemoglobin levels in patients with chronic kidney disease.  On November 16, 2006, Roche announced that the results of the CREATE trial "clearly show that there is no additional cardiovascular benefit from treating to higher hemoglobin levels in this patient group."

On November 20, Amgen posted a public statement responding to the CHOIR and CREATE trials.  Amgen wrote, "A very substantial body of evidence, developed over the past 17 years, demonstrates that anemia associated with chronic kidney disease can be treated safely and effectively with EPOGEN and Aranesp when administered according to the Food and Drug Administration (FDA)-approved dosing guidelines."  Two weeks later, Amgen issued a press release to correct "what the company believes are misleading and inaccurate news reports regarding the use of its drugs." Amgen reiterated, "EPOGEN and Aranesp are effective and safe medicines when administered according to the Food and Drug Administration (FDA) label."

Amgen also conducted its own clinical trial, the "103 Study."  103 Study tested Aranesp in 939 patients with anemia secondary to cancer.  The FDA later described the

103 Study as "demonstrat[ing] significantly shorter survival rate[s] in cancer patients receiving ESAs as compared to th[o]se receiving transfusion support." However, during a January 2007 conference call, an Amgen representative described the 103 Study as not demonstrating a "statistically significant adverse [e]ffect of Aranesp on overall mortality in this patient population." He said that "the risk benefit ratio for Aranesp in these extremely ill patients with anemia secondary to malignancy is, at best, neutral and perhaps negative." During what may have been the same conference call, discussing Amgen's fourth-quarter earnings on January 25, an Amgen representative stated, in response to concerns expressed about the 103 Study, that "we have a well established risk benefit profile."

During a February 16, 2007, investor conference call, defendant Kevin Sharer, Amgen's President, Chief Executive Officer, and Chairman of the Board, stated, "We strongly believe, as we have consistently stated, that Aranesp and EPOGEN are safe and effective medicines when used in accordance with label indications." During a March conference call, defendant Sharer reiterated, "When we look at the totality of data, we believe our products are safe and effective when used on-label." On March 9, 2007, Amgen posted a statement on the company website available to plan participants under the title "Amgen's Statement on the Safety of Aranesp (darbepoetin alfa) and EPOGEN (Epoetin alfa)":

> Aranesp (darbepoetin alfa) and EPOGEN (Epoetin alfa) have favorable risk/benefit profiles in approximately four million patients with chemotherapy-induced anemia or CKD when administered according to the FDA-approved dosing guidelines.

Amgen engaged in extensive marketing, encouraging both on- and off-label uses of its ESAs. Amgen trained its sales representatives to ask questions that steered doctors to discussions about off-label uses. In an Amgen sales personnel manual, Amgen gave an "expanded list" of "excellent questions" to ask doctors in order to move the discussions toward off-label uses. Examples include, "What is keeping you from using Aranesp in all your MDS/HIV/CIA patients?" MDS is myelodysplastic syndrome, an illness often resulting in anemia. The FDA has never approved Aranesp to treat MDS or HIV patients.

Amgen created a speakers program in which Amgen paid for dinners at which "expert" speakers talked to physicians and other providers about off-label uses for Aranesp. Speakers program events were not accredited as continuing medical education seminars conducted by an independent medical association. Amgen paid not only the speakers but also the doctors and other medical providers who attended the events. The $1,000 payments to physician attendees were "paid from [Amgen's] marketing budget."

Amgen educated medical providers about the profit they could obtain by prescribing its ESAs. Before January 1, 2005, Medicare calculated drug reimbursement rates based on the average wholesale price ("AWP") of drugs. Medical providers could purchase Amgen's ESAs at a price lower than the AWP, but could charge Medicare the AWP. Amgen created spreadsheets and other tools to help providers calculate the profit. Amgen also encouraged doctors to use its ESAs inefficiently. For example, it encouraged doctors to deliver Epogen intravenously rather than subcutaneously, because an intravenous delivery of the drug requires a substantially larger dose to achieve the same effect.

Amgen marketing efforts were successful. For example, Amgen's worldwide sales of Aranesp increased fourteen percent during the first quarter of 2007 compared to the same quarter in 2006. Amgen told investors on several occasions that its marketing practices were proper. In public SEC filings, Amgen stated that it marketed its products only for on-label uses. In December 2006, in response to negative publicity about off-label uses, Amgen issued a press release "intended to clarify Amgen's position on the use of EPOGEN and Aranesp and to correct what the company believes are misleading and inaccurate news reports regarding the use of its drugs." The company clarified that "Amgen only promotes the use of EPOGEN and Aranesp consistent with the FDA label." On a January 2007 conference call, Amgen stated that "our promotion [of EPOGEN] has always been strictly according to our label, we do not anticipate a major shift in clinical practice."

In February 2007, *The Cancer Letter* published an article entitled "Amgen Didn't Tell Wall Street About Results of [DAHANCA] Study." The article reported that the DAHANCA trial had been temporarily halted due to the "significantly inferior therapeutic outcome from adding Aranesp to radiation treatment of patients with head and neck cancer." On February 23, the Associated Press announced that the USP DI, an influential drug reference guide, had delisted Aransep as a treatment for anemia in cancer patients not undergoing chemotherapy. On February 27, the *New York Times* published an article stating:

> New studies are raising questions about whether drugs that have been used by millions of cancer patients might actually be harming them. The drugs, sold by Amgen, Roche, and

> Johnson & Johnson, are used to treat anemia
> caused by chemotherapy and meant to reduce
> the need for blood transfusions and give
> patients more energy.  But the new results
> suggest that the drugs may make the cancer
> itself worse. . . . [S]ome cancer specialists and
> securities analysts say the new information
> may make doctors more cautious in using the
> drugs, which have combined sales for the
> three companies exceeding $11 billion and
> have been heavily promoted through efforts
> that include television commercials.

On March 9, the FDA mandated a "black box" warning
for off-label use of Aranesp and Epogen.  A black box
warning is the strongest warning the FDA can require.  *Cf.*
21 C.F.R. § 201.57(c)(1) (2012).  The black box warning
read:

> Recently completed studies describe an
> increased risk of death, blood clots, strokes,
> and heart attacks in patients with kidney
> failure where ESAs were given at higher than
> recommended doses.  In other studies, more
> rapid tumor growth occurred in patients with
> head and neck cancer who received these
> higher doses.  In studies where ESAs were
> given at recommended doses, an increased
> risk of death was reported in patients with
> cancer who were not receiving chemotherapy
> and an increased risk of blood clots was
> observed in patients following orthopedic
> surgery.

On March 21, 2007, two House of Representatives subcommittees opened an investigation into the safety profile of Aranesp and Epogen as well as into Amgen's off-label marketing practices. The Chairs of those two subcommittees "ordered" Amgen to halt direct-to-consumer advertising and physician incentives pending further FDA action. On May 8, the FDA noted on its website that Aranesp and Epogen "were clearly demonstrated to be unacceptable" in high doses. On May 10, ODAC reconvened and voted to restrict the use of ESAs, to expand existing warnings, and to require ESA manufacturers to conduct further studies.

Defendant Sharer, Amgen's President and CEO, told a Wall Street Journal reporter in an interview that 2007 was the "most difficult [year] in [Amgen's] history." According to Sharer, there was an "unexpected $800 million to $1 billion hit to operating income due to safety concerns" about Aranesp. Sales of Aranesp decreased by fifty percent.

Amgen stock, and thus the Amgen Common Stock Fund, lost significant value as a result of these safety concerns. The class period runs from May 4, 2005, to March 9, 2007. Amgen common stock was at its high of $86.17 on September 19, 2005. On February 16, 2007, when *The Cancer Letter* published its article revealing that Amgen had not been forthcoming about the result of the DAHANCA 10 Trial, Amgen stock sold for $66.73. When ODAC voted to restrict the use of ESA drugs, on or shortly after May 10, the price of Amgen stock dropped to $57.33, the class period low. Between September 19, 2005 and the ODAC vote, the price of Amgen stock dropped $28.83, or thirty-three percent.

On August 20, 2007, plaintiffs Steve Harris, a participant in the Amgen Plan, and Dennis Ramos, a participant in the

AML Plan, filed a complaint alleging that defendants breached their fiduciary duties under ERISA. The district court dismissed Harris's claims for lack of standing, on the ground that Harris no longer owned assets in the Amgen Plan on the date he filed his complaint. *Harris v. Amgen, Inc.*, 573 F.3d 728, 731 (9th Cir. 2009). The court dismissed Ramos's claims without leave to amend on the ground that he had failed to identify the proper fiduciaries of the AML Plan. *Id.* We reversed, holding that Harris had standing as a "participant" of the Amgen Plan during the Class Period, and that Ramos should have been allowed to amend the complaint. *Id.*

The complaint now at issue is the First Amended Class Action Consolidated Complaint ("FAC"), filed on March 23, 2010, by five plaintiffs, including Harris and Ramos. The FAC alleges six counts of violation of fiduciary duty under ERISA against Amgen, AML, nine Directors of the Amgen Board ("the Directors"), and the Plans' Fiduciary Committees and their members. The district court dismissed the FAC against Amgen on the ground that it was not a fiduciary. It dismissed the FAC against the remaining defendants under Rule 12(b)(6) for failure to state a claim.

In a separate class action simultaneously pending before the same district judge, investors in Amgen common stock claimed violations of federal securities laws based on the same alleged facts as in the ERISA action now before us. In a careful thirty-five page order, the district court concluded that the investors had sufficiently alleged material misrepresentations and omissions, scienter, reliance, and resulting economic loss to state claims under Sections 10(b) and 20(a) of the 1934 Exchange Act. *See* 15 U.S.C. §§ 78j(b), 78t(a). The district court certified a class based on

the facts alleged in the complaint. We affirmed the district court's class certification in *Conn. Ret. Plans & Trust Funds v. Amgen, Inc.,* 660 F.3d 1170 (9th Cir. 2011). The Supreme Court affirmed in *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, __ U.S.__, 133 S. Ct. 1184 (2013).

For the reasons that follow, we reverse the district court's decision in the ERISA case before us.

## II. Standard of Review

"We review *de novo* the district court's grant of a motion to dismiss under Rule 12(b)(6), accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.*, 551 U.S. at 322. We then determine whether the allegations in the complaint and information from other permissible sources "plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (quoting *Iqbal*).

## III. Discussion

Congress enacted ERISA to provide "minimum standards . . . assuring the equitable character of [employee benefit] plans and their financial soundness." 29 U.S.C. § 1001(a). These minimum standards regulate the "conduct, responsibility, and obligation for fiduciaries of employee

benefit plans . . . ." *Id.* § 1001(b). "Congress painted with a broad brush, expecting the federal courts to develop a 'federal common law of rights and obligations' interpreting ERISA's fiduciary standards." *Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1047 (9th Cir. 2000) (en banc) (citation omitted).

The Supreme Court has established certain interpretive rules specific to ERISA's fiduciary duties. These duties, including those governing fiduciary status, "draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment." *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996). ERISA reflects a "congressional determination that the common law of trusts did not offer completely satisfactory protection." *Id.* at 497. The law of trusts "often . . . inform[s]" but does "not necessarily determine the outcome of" an interpretation of ERISA's fiduciary duties. *Id.* The common law of trusts offers "only a starting point" that must yield to the "language of the statute, its structure, or its purposes," if necessary. *Id.*

We first address the sufficiency of the FAC against each properly named fiduciary. We then address whether the plaintiffs have adequately alleged that Amgen is a fiduciary.

## A.  Sufficiency of the FAC

The district court dismissed all six counts of the FAC under Rule 12(b)(6). Plaintiffs have appealed only the dismissal of Counts II through VI.

### 1. Count II

Plaintiffs allege in Count II that defendants acted imprudently, and thereby violated their duty of care under

29 U.S.C. § 1104(a)(1)(B), by continuing to provide Amgen common stock as an investment alternative when they knew or should have known that the stock was being sold at an artificially inflated price. Defendants contend that they are entitled to a "presumption of prudence" under *Quan v. Computer Sci. Corp.*, 623 F.3d 870 (9th Cir. 2010). They contend that if this presumption is applied, their action in continuing to provide Amgen stock as an investment alternative was prudent. Defendants contend, further, that their action was prudent even if the presumption of prudence does not apply.

### a. Presumption of Prudence

In *Quan*, we agreed with several of our sister circuits that the "presumption of prudence" applies to certain investment decisions by ERISA fiduciaries. *See* 623 F.3d at 880–81 (citing *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995)); *see also In re Citigroup ERISA Litig.*, 662 F.3d 128, 138 (2d Cir. 2011); *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008); *Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995). The question presented in *Quan* was whether the prudent investor standard that is normally applicable to ERISA fiduciaries should apply to fiduciaries of plans that invest in stock of an employee's company.

The basic problem may be seen in the text of ERISA itself. In relevant part, it provides:

> (a) Prudent man standard of care
>
> (1) fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —

. . .

> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so . . .
>
> . . .
>
> (2) In the case of an eligible individual account plan . . . , the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities . . . .

29 U.S.C. § 1104. On the one hand, Congress desired to protect plan investments of employees. It therefore specified that the prudent man standard of care requires a fiduciary to diversify investments held by a plan. *See id.* § 1104(a)(1)(B) and (C). On the other hand, Congress desired to permit employers to provide loyalty incentives to their employees. It therefore specified that the prudent man diversification requirement is not violated when an employer's stock is

acquired or held in an employee's individual account plan. *See id.* § 1104(2). However, Congress did not specify that anything other than a failure to diversify is exempt from the prudent man standard of care.

For reasons we explained in detail in *Quan*, we adopted the presumption of prudence, first articulated by the Third Circuit in *Moench*, to reconcile the tension between Congress' two desires. We held that a fiduciary is entitled to a presumption that he has been a prudent investor "when plan terms *require or encourage* the fiduciary to invest primarily in employer stock." *Quan*, 623 F.3d at 881 (emphasis added). We applied the *Moench* presumption of prudence to ERISA stock ownership plans, whether they are "eligible individual account plans" ("EIAPs") or "employee stock ownership plans" ("ESOPs"). *Id.*; *see also* 29 U.S.C. § 1107(d)(3)(A), (d)(6). We held that the terms of the plan at issue in *Quan* satisfied the "required or encouraged" criterion of *Moench* because the plaintiffs had not shown "that the Committee had discretion to halt purchases of [the employer's] common stock or to invest Plan assets that were required to be invested in the [employer's] stock fund in other assets instead." 623 F.3d at 884.

The Amgen and AML Plans are EIAPs. The parties agree that the question before us is whether the Plans "required or encouraged" the fiduciaries to invest in Amgen stock. To answer that question, we look to the written terms of the Plans. Because the terms of the Plans differ in only immaterial respects, we quote only from the Amgen Plan.

Article 6.1 of the Amgen Plan provides:

> All contributions to the Plan made pursuant to Articles 4 and 5 shall be paid to the Trust fund established under the Plan. All such contributions shall be invested as provided under the terms of the Trust Agreement, which *may* include provision for the separation of assets into separate Investment Funds, including a Company Stock Fund.

(emphasis added). The Summary Plan Description specifies twenty-five separate "Investment Funds" in which participants can invest their money. The twenty-fourth fund on the list is a "Company Stock Fund," referred to in the Plan Description as the "Amgen Common Stock Fund." The Amgen Common Stock Fund holds only Amgen common stock. Article 6.2 of the Plan provides that plan participants may invest no more than fifty percent of their funds in the Company Stock Fund. If a plan participant fails to designate a fund, the default is an investment in "the Fidelity Freedom Fund that is appropriate based on the Participant's date of birth."

There is no language in the Plans requiring that a Company Stock Fund be established as an available investment for plan participants. *Cf.* Restatement (Second) of Trusts, § 227 cmt. t ("If [a trustee] is merely authorized to make certain investments, he has a privilege but not a duty to make such investments."). Nor is there language in the Plans requiring that a Company Stock Fund, once established, be continued as an available investment. Defendants therefore do not contend that the Plans require them to provide a Company Stock Fund as an investment alternative. They

contend only that the Plans encourage them to do so. If defendants are right that the terms of the Plans encourage them to invest in a Company Stock Fund, they are entitled under *Quan* to a presumption of prudence.

Defendants make four arguments. None is persuasive. First, defendants point out that the Plans specifically refer to a Company Stock Fund as a permissible investment, but specifically refer to no other company's stock. Defendants are correct in their description of the Plans. But an explicit statement that plan fiduciaries *may* offer a Company Stock Fund as an investment to participants does not tell us that they were encouraged to do so within the meaning of the presumption of prudence. Under the common law of trusts, "[a]n authorization by the terms of the trust to invest in a particular type of security does not mean that any investment in securities of that type is proper. The trustee must use care and skill and caution in making the selection." Restatement (Second) of Trusts, § 227 cmt. v. We agree with the Second Circuit, which recently concluded that almost identical plan language does not give rise to the presumption of prudence. In *Taveras v. UBS AG*, 708 F.3d 436 (2d Cir. 2013), the court wrote:

> [I]t is likely that many EIAPs will, when possible, provide their fiduciaries a discretionary means by which to offer plan participants the ability to invest in the employer's stock. If the presumption of prudence was triggered in every instance where the EIAP plan document, as here, simply (1) named and defined the employer's stock in the plan document's terms, and (2) allowed for the employer's stock to be offered

> by the plan's fiduciaries on a discretionary
> basis to plan participants, then we are hard
> pressed to imagine that there exists *any* EIAP
> that merely offered the option to participants
> to invest in their employer's stock whose
> fiduciaries would not be entitled to the
> presumption of prudence.

*Id.* at 445 (emphasis in original).

Second, defendants point out that the Plans contain provisions regulating the purchase, transfer, and distribution of Amgen stock, as well as providing voting rights to plan participants holding such stock. Here, too, defendants are correct in their description of the Plans, but incorrect in the conclusion they draw. Some of the provisions to which defendants point discourage rather than encourage investment in Amgen stock. For example, a participant's holding in the Amgen Common Stock Fund may not exceed fifty percent of a participant's total holdings. Holdings in other funds are not subject to any maximum percentage. Plans also restrict the frequency and timing of the sale of Amgen stock in order to comply with Section 16(b) of the Securities Exchange Act of 1934. The remaining provisions on which Amgen relies are simply irrelevant to the issue before us.

Third, defendants state in their brief that the record "clearly indicates that it was the company's 'longstanding practice and intent that the inclusion of Amgen Inc. common stock is part of the Plan design.'" The language quoted by defendants comes from a summary description of an amendment to the AML Plan that took effect in 2008, after this lawsuit was filed. Defendants do not quote in their brief the actual language of the amendment which they contend

"clearly indicates" the "longstanding practice and intent" of the Plans. The language of the 2008 amendment is:

> The Company Stock Fund *will be* an Investment Fund under the Plan. The Fiduciary Committee shall designate other Investment Funds from time to time for investment of Participant's Accounts, provided that the Fiduciary Committee *may not eliminate the Company's Stock Fund as an Investment Fund.*

(emphasis added). As we noted above, the earlier language (in effect during the class period) provides only that a Company Stock Fund "may" be included as an available investment. The language in the 2008 amendment provides that a Company Stock Fund "will be" an available investment, and further specifies that this Fund "may not [be] eliminate[d]." This new language hardly reflects a "longstanding practice and intent."

Fourth, defendants contend that the Plans would have to have been amended in order to make Amgen stock unavailable to plan participants. We see nothing in the Plans to support defendants' contention.

We conclude that defendants were neither required nor encouraged by the terms of the Plans to invest in Amgen stock, and that they are not entitled to a presumption of prudence. The normal prudent man standard therefore applies to defendants' investment decisions as fiduciaries under the Plans.

### b. Prudent Man Standard of Care

ERISA requires that a fiduciary perform duties under a plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This standard governs a fiduciary's decision to allow investment of plan assets in employer stock. *Quan*, 623 F.3d at 878–79. "This is true, even though the duty of prudence may be in tension with Congress's expressed preference for plan investment in the employer's stock." *Id.* at 879 (internal quotation marks omitted). A "myriad of circumstances" surrounding investments in company stock could support a violation of the prudence requirement. *In re Syncor*, 516 F.3d at 1102. "'A court's task in evaluating a fiduciary's compliance with this standard is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Quan*, 623 F.3d at 879 (quoting *Wright*, 360 F.3d at 1097) (alterations and quotation marks omitted).

In *Syncor*, we held that "[a] violation [of the prudent man standard] may occur where a company's stock . . . was artificially inflated during that time by an illegal scheme in which the fiduciaries knew or should have known, and then suddenly declined when the scheme was exposed." *In re Syncor*, 516 F.3d at 1102. In *Syncor*, the company was a fiduciary that knowingly made cash bribes to doctors in Taiwan in violation of the Foreign Corrupt Practices Act. Upon disclosure of these illegal payments, Syncor's stock price lost nearly half its value. "Despite these illegal

practices, the [fiduciaries] allowed the Plan to hold and acquire Syncor stock when they knew or had reason to know of Syncor's foreign bribery scheme." *Id.* at 1098. We held on appeal from summary judgment that "there is a genuine issue whether the fiduciaries breached the prudent man standard by knowing of, and/or participating in, the illegal scheme while continuing to hold and purchase artificially inflated Syncor stock for the ERISA Plan." *Id.* at 1103.

Count II alleges that defendants knew or should have known about material omissions and misrepresentations, as well as illegal off-label sales, that artificially inflated the price of the stock while, at the same time, they continued to offer the Amgen Common Stock Fund as an investment alternative to plan participants. The district court held that, even without the assistance of the presumption of prudence, defendants were entitled to dismissal of Count II under Rule 12(b)(6).

Defendants make five arguments in favor of dismissal. Again, none is persuasive. First, defendants contend that investments in Amgen stock during the class period were not imprudent "because Amgen was not even remotely experiencing severe financial difficulties during that time, and remains a strong, viable, and profitable company today." This argument is beside the point. Amgen was not "experiencing severe financial difficulties" during the relevant time period in part because of the very actions about which plaintiffs are now complaining, that were producing large but unsustainable profits. Further, Amgen may now be a "strong, viable, and profitable company," but that does not mean that the price of Amgen stock was not artificially inflated during the class period.

Second, defendants contend that the decline in price in Amgen stock was insufficient to show an imprudent investment by the fiduciaries. They write, "[A]s the District Court correctly held, this 'relatively modest and gradual decline in the stock price' does not render the investment imprudent." As an initial matter, we note that the proper question is not whether the investment results were unfavorable, but whether the fiduciary used "'appropriate methods'" to investigate the merits of the transaction. *Quan*, 623 F.3d at 879 (quoting *Wright*, 360 F.3d at 1097); *see also Kirschbaum*, 526 F.3d at 254 (explaining that the "test of prudence is one of conduct, not results"); *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (same). But defendants' argument fails even on its own terms. Their argument is foreclosed by the district court's decision in the federal securities class action against Amgen based on the same alleged sequence of events. *See Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*, 660 F.3d 1170 (9th Cir. 2011), *aff'd Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, __ U.S.__, 133 S. Ct. 1184 (2013). If the alleged misrepresentations and omissions, scienter, and resulting decline in share price in *Connecticut Retirement Plans* were sufficient to state a claim that defendants violated their duties under Section 10(b), the alleged misrepresentations and omissions, scienter, and resulting decline in share price in this case are sufficient to state a claim that defendants violated their more stringent duty of care under ERISA.

Third, quoting *Kirschbaum*, 526 F.3d at 253, 256, defendants contend that

> [w]hen, like here, retirement plans are at issue, courts must be mindful of "the long-term horizon of retirement investing, as well

as the favored status Congress has granted to employee stock investments in their own companies." . . . [H]olding fiduciaries liable for continuing to offer the option to invest in declining stock would place them in an "untenable position of having to predict the future of the company stock's performance. In such a case, [a fiduciary] could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded."

Defendants' reliance on *Kirschbaum* is misplaced. The court wrote in that case, "The Plan documents, considered as a whole, compel that the Common Stock Fund be available as an investment option for employee-participants." *Kirschbaum*, 526 F.3d at 249. The concerns expressed in *Kirschbaum* have little bearing on the case before us. Here, unlike in *Kirschbaum*, the fiduciaries of the Amgen and AML Plans were under no such compulsion. They knew or should have known that the Amgen Common Stock Fund was purchasing stock at an artificially inflated price due to material misrepresentations and omissions by company officers, as well as by illegal off-label marketing, but they nevertheless continued to allow plan participants to invest in the Fund.

Fourth, quoting *In re Computer Sciences Corp., ERISA Litig.*, 635 F. Supp. 2d 1128, 1136 (C.D. Cal. 2009), *aff'd* 623 F.3d 870 (9th Cir. 2010), defendants contend that if the Amgen Fund had been "remove[d] . . . as an investment option," this action "may have brought about 'precisely the result [P]laintiffs seek to avoid: a drop in the stock price.'" It is unclear how much the price of Amgen stock would have

declined if the Amgen Common Stock Fund had been removed as an investment option during the period when the price was artificially inflated. Removing the Fund as an investment option would not have meant liquidation of the Fund. It would have meant only that while the share price was artificially inflated, plan participants would not have been allowed to invest additional money, and that the Fund would therefore not have purchased additional shares at the inflated price. Given the relatively small number of Amgen shares that would not have been purchased by the Fund in comparison to the enormous number of actively traded shares, it is extremely unlikely that this decrease in the number of shares purchased, considered alone, would have had an appreciable negative impact on the share price.

It is true that removing the Amgen Common Stock Fund as an investment option would have sent a negative signal to the wider investing public, and that such a signal may well have caused a drop in the share price. But several factors mitigate this effect. The efficient market hypothesis ordinarily applied in stock fraud cases suggests that the ultimate decline in price would have been no more than the amount by which the price was artificially inflated. Further, once the Fund was removed as an investment option, employees would have been prevented from making additional investments in the Fund while the price remained artificially inflated. Finally, the fiduciaries' obligation to remove the Fund as an investment option was triggered as soon as they knew or should have known that the share price was artificially inflated. That is, defendants violated their fiduciary duties under ERISA at more or less the same time some of them violated their duties under the federal securities laws. If the defendants had timely complied with their duties under ERISA, there would have been little or no artificial

increase in the share price before the Fund was removed as an investment option.  In the actual event, however, defendants continued to authorize the Fund as an investment option for a considerable time after they knew or should have known that the share price was artificially inflated.

Fifth, defendants argue that "they could not have removed the Amgen Stock Fund based on undisclosed alleged adverse material information — a potentially *illegal* course of action." (emphasis in original).  Defendants misunderstand the nature of their duties under federal law.  As we noted in *Quan*, "[F]iduciaries are under no obligation to violate securities laws in order to satisfy their ERISA fiduciary duties." *Quan*, 623 F.3d at 882 n.8.  The central problem in this case is that Amgen officials, many of whom are defendants here, made material misrepresentations and omissions in violation of the federal securities laws.  Compliance with ERISA would not have required defendants to violate those laws; indeed, compliance with ERISA would likely have resulted in compliance with the securities laws.  If defendants had revealed material information in a timely fashion to the general public (including plan participants), thereby allowing informed plan participants to decide whether to invest in the Amgen Common Stock Fund, they would have simultaneously satisfied their duties under both the securities laws and ERISA. *See Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1045 (9th Cir. 2001) ("ERISA imposes upon fiduciaries a general duty to disclose facts material to investment issues."); *Acosta v. Pac. Enter.*, 950 F.2d 611, 619 (9th Cir. 1991) (holding that a fiduciary is affirmatively required to "inform beneficiaries of circumstances that threaten the funding of benefits").  Alternatively, if defendants had made no disclosures but had simply not allowed additional investments in the Fund while

the price of Amgen stock was artificially inflated, they would not thereby have violated the prohibition against insider trading, for there is no violation absent purchase or sale of stock.

We therefore conclude that plaintiffs have sufficiently alleged that defendants have violated the duty of care they owe as fiduciaries under ERISA.

## 2. Count III

Plaintiffs allege in Count III that defendants violated their duty of loyalty and care under 11 U.S.C. §§ 1104(a)(1)(A) and (B) by failing to provide material information to plan participants about investment in the Amgen Common Stock Fund. Defendants contend that they have limited obligations under ERISA to disclose information to plan participants, and that their disclosure obligations do not extend to information that is material under the federal securities laws. Defendants contend, further, that plaintiffs have not alleged detrimental reliance by plan participants on defendants' omissions and misrepresentations. Finally, defendants contend that their omissions and misrepresentations, if any, were not made in their fiduciary capacity. For the reasons that follow, we disagree.

To some extent, the analysis for Count II overlaps with the analysis for Count III. We have already established that we must analyze defendants' duty of care without resort to the presumption of prudence under *Quan*. We have also established that there is no contradiction between defendants' duty under the federal securities laws and ERISA. Indeed, properly understood, these laws are complementary and reinforcing.

Defendants' first contention is that they owe no duty under ERISA to provide material information about Amgen stock to plan participants who must decide whether to invest in such stock. In other words, defendants contend that their fiduciary duties of loyalty and care to plan participants under ERISA, with respect to company stock, are less than the duty they owe to the general public under the securities laws. Defendants are wrong, as we made clear in *Quan*:

> We have recognized [that] . . . "[a] fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information." *Barker* [*v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995)]. "[T]he same duty applies to 'alleged material misrepresentations made by fiduciaries to participants regarding the risks attendant to fund investment.'" *Edgar* [*v. Avaya Inc.*, 503 F.3d 340, 350 (3d Cir. 2007)].

*Quan*, 623 F.3d at 886. We specifically endorsed the Third Circuit's definition of materiality in *Quan*. We wrote, "[A] misrepresentation is 'material' if there was a substantial likelihood that it would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in a particular fund." *Id.* (quoting *Edgar*, 503 F.3d at 350) (internal quotation marks omitted).

Defendants' second contention is that plaintiffs have failed to show that they relied on defendants' material omissions and misrepresentations. Defendants contend that plaintiffs must show that they actually relied on the omissions

and misrepresentations. It is well established under Section 10(b) that a defrauded investor need not show actual reliance on the particular omissions or representations of the defendant. Instead, as the Supreme Court explained in *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011), the investor can rely on a rebuttable presumption of reliance based on the "fraud-on-the-market" theory:

> According to that theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." [*Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988)]. Because the market "transmits information to the investor in the processed form of a market price," we can assume, the Court explained [in *Basic*], that an investor relies on public misstatements whenever he "buys or sells stock at the price set by the market." *Id.*[] at 244, 247.

*Erica P. John Fund*, 131 S. Ct. at 2185; *see also Conn. Ret. Plans & Trust*, 133 S. Ct. 1184 (2013). We see no reason why ERISA plan participants who invested in a Company Stock Fund whose assets consisted solely of publicly traded common stock should not be able to rely on the fraud-on-the-market theory in the same manner as any other investor in publicly traded stock.

Defendants' final contention is that statements made to the Securities and Exchange Commission in documents required by the federal securities laws were not made in a fiduciary capacity, and that these statements therefore cannot be considered in an ERISA suit for breach of fiduciary duty.

Although our circuit has not decided the issue, defendants might be correct if these documents had only been filed and distributed as required under the securities laws, for such acts would have been performed in a corporate capacity. *See Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1285 (11th Cir. 2012) ("When the defendants in this case filed the Form S-8s and created and distributed the stock prospectuses, they were acting in their corporate capacities and not in their capacity as ERISA fiduciaries."); *Kirschbaum*, 526 F.3d at 257 ("REI was discharging its corporate duties under the securities laws, and was not acting as an ERISA fiduciary."). However, defendants did more than merely file and distribute the documents as required by the securities laws. *See Varity Corp.*, 516 U.S. at 504 (fiduciary may be "communicating with [plan participants] *both* in its capacity as employer *and* in its capacity as plan administrator") (emphasis in original).

As they were required to do under ERISA, defendants prepared and distributed summary plan descriptions ("SPDs") to Plan participants. *See* 29 U.S.C. § 1022(a) (requiring fiduciaries to provide a summary plan description). In the SPDs for both the Amgen and the AML Plans, defendants explicitly incorporated by reference Amgen's SEC filings, including "The Company's Annual Report on Form 10-K for the year ending December 31, 2006," and "The Company's Current Reports on Form 8-K filed on January 19, 2007, February 20, 2007, March 2, 2007, and March 12, 2007, respectively." Plaintiffs allege that the defendants knew or should have known that statements contained in these filings, incorporated by reference into the SPDs, were materially false and misleading.

We hold that defendants' preparation and distribution of the SPDs, including their incorporation of Amgen's SEC

filings by reference, were acts performed in their fiduciary capacities. In so holding, we agree with the Sixth Circuit, which has held that such incorporation by reference is an act performed in a fiduciary capacity:

> Defendants exercised discretion in choosing to incorporate the [SEC] filings into the Plan's SPD as a direct source of information for Plan participants about the financial health of [the company] and the value of its stock, an investment option under the plan. The SPD is a fiduciary communication to plan participants and selecting the information to convey through the SPD is a fiduciary activity. Moreover, whether the fiduciary states information in the SPD itself or incorporates by reference another document containing that information is of no moment. To hold otherwise would authorize fiduciaries to convey misleading or patently untrue information through documents incorporated by reference, all while safely insulated from ERISA's governing reach. Such a result is inconsistent with the intent and stated purposes of ERISA . . . and would create a loophole in ERISA large enough to devour all its protections.

*Dudenhoefer v. Fifth Third Bancorp*, 692 F.3 410, 423 (6th Cir. 2012) (internal citation omitted); *see also In re Citigroup ERISA Litigation*, 662 F.3d 128, 144–45 (2d Cir. 2011) (noting that SEC filings had been incorporated in the Plans' SPDs, but dismissing ERISA claim on the ground that plaintiffs had not sufficiently alleged that the defendant

fiduciaries knew or should have known that the filings contained false information); *Quan*, 623 F.3d at 886 (assuming, "without deciding, that alleged misrepresentations in SEC disclosures that were incorporated into communications about an ERISA plan are 'fiduciary communications' on which an ERISA misrepresentation claim can be based.") (citations omitted).  The statements made in Amgen's SEC filings and incorporated in the Plans' SPDs may therefore be used under ERISA to show that defendants knew or should have known that the price of Amgen shares was artificially inflated, and to show that plaintiffs presumptively detrimentally relied on defendants' statements under the fraud-on-the-market theory.

### 3. Counts IV and V

The district court correctly concluded that Counts IV and V are derivative of Counts II and III.  Because we reverse the district court's dismissal of Counts II and III, we also reverse its dismissal of Counts IV and V.  *See In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### 4.  Count VI

Count VI alleges that defendants caused the Plans directly or indirectly to sell or exchange property with a party-in-interest, in violation of 29 U.S.C. § 1106(a).  Specifically, Count VI alleges that Amgen and AML are parties-in-interest that concealed material information in order to inflate the price of Amgen stock sold to the Plans.  In relevant part, 29 U.S.C. § 1106(a)(1) provides,

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he

knows or should know that such transaction
constitutes a direct or indirect –

(A)  sale or exchange, or leasing, of any
property between the plan and a party in
interest; . . .

(D)   transfer to, or use by or for the
benefit of a party in interest, of any assets
of the plan[.]

A party in interest includes "any fiduciary" of a plan or "an
employer" of the plan beneficiaries.  29 U.S.C. § 1002(14).

Defendants did not argue in the district court that Count
VI fails to state a prohibited transaction claim under
§ 1106(a)(1).  Nor do they raise this argument on appeal.
Instead, defendants argue that 29 U.S.C. § 1108(e) exempts
the sale of employer stock from the restrictions of
§ 1106(a)(1).

Section 1108(e) specifies that § 1106 does not prohibit the
purchase or sale of employer stock if, as relevant here, (1) the
sale price was the "price . . . prevailing on a national
securities exchange"; (2) no commission is charged for the
transaction, and (3) the plan is an EIAP.   29 U.S.C.
§§ 1107(d)(5), (e)(1), 1108(e).

In *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996),
we held that because § 1108(e) is an affirmative defense, a
defendant has the burden to prove its applicability.  We
explained, "A fiduciary who engages in a self-dealing
transaction pursuant to 29 U.S.C. § [1106(a)] has the burden
of proving that he fulfilled his duties of care and loyalty and

that the ESOP received adequate consideration [under § 1108(e)].” *Id.*; *see also Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978) (“The settled law is that in [prohibited self-dealing transactions] the burden of proof is always on the party to the self-dealing transaction to justify its fairness [under a statutory exception].”).  Citing *Howard*, the Eighth Circuit has held that a plaintiff need not plead in his complaint that a transaction was not exempt under § 1108(e). *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 600–01 (8th Cir. 2009); *see also Jones v. Bock*, 549 U.S. 199, 211–12 (2007) (holding that a plaintiff need not plead the absence of an affirmative defense, even a defense like exhaustion of remedies, which is “mandatory”).

Because the existence of an exemption under § 1108(e) is an affirmative defense, we can dismiss Count VI based on the § 1108(e) exemption only if the defense is “clearly indicated” and “appear[s] on the face of the pleading.”  5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004); *see also Jones*, 549 U.S. at 215 (citing Wright & Miller for rule that affirmative defense must appear on the face of the complaint).  Here, we cannot say that the face of the complaint clearly indicates the availability of a § 1108(e) defense.

### B.  Amgen as Properly Pled Fiduciary

Amgen argues that it is not a fiduciary under the Plan because it has delegated its discretionary authority.  “To be found liable under ERISA for breach of the duty of prudence and for participation in a breach of fiduciary duty, an individual or entity must be a ‘fiduciary.’”  *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004).  In defining a fiduciary, ERISA says,

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). "We construe ERISA fiduciary status 'liberally, consistent with ERISA's policies and objectives.'" *Johnson v. Couturier*, 572 F.3d 1067, 1076 (9th Cir. 2009) (quoting *Ariz. State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir. 1997)). Whether a defendant is a fiduciary is a question of law we review de novo. *See Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996).

Under ERISA, a "named fiduciary" is "a fiduciary who is named in the plan instrument." 29 U.S.C. § 1102(a)(2). The Amgen Plan provides that Amgen is "the 'named fiduciary,' 'administrator[,]' and 'plan sponsor' of the Plan (as such terms are used in ERISA)." ERISA grants a named fiduciary broad authority to "control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). "Generally, if an ERISA plan expressly provides for a procedure allocating fiduciary responsibilities to persons other than named fiduciaries under the plan, the named fiduciary is not liable for an act or omission of such person in carrying out such responsibility." *Ariz. State Carpenters*, 125 F.3d at 719–20 (citing 29 U.S.C. § 1105(c)(2)).

Amgen argues that it delegated authority to trustees and investment managers. Section 15.1 of the Plan provides, "To the extent that the Plan requires an action under the Plan to be taken by the Company [Amgen], the party specified in this Section 15.1 shall be authorized to act on behalf of the Company." Section 15.1 says nothing about delegation to trustees and investment managers. Rather, it explains that the Fiduciary Committee has the authority, on behalf of the Company, to "review the performance of the Investment Funds . . . and make recommendations" and to "otherwise control and manage the Plan's assets." In the absence of a Fiduciary Committee, the Global Benefits Committee will perform these tasks. Section 14.2 of the Plan governs the relationship between Amgen ("the Company") and the trustees and managers. It provides:

> The Trustee shall have the exclusive authority and discretion to control and manage assets of the Plan it holds in trust, except to the extent that . . . the Company directs how such assets shall be invested [or] the Company allocates the authority to manage such assets to one or more Investment Managers. Each Investment Manager shall have the exclusive authority to manage, including the authority to acquire and dispose of, the assets of the Plan assigned to it by the Company, except to the extent that the Plan prescribes or the Company directs how such assets shall be invested. Each Trustee and Investment Manager shall be solely responsible for diversifying, in accordance with Section 404(a)(1)(C) of ERISA, the investment of the assets of the Plan assigned

to it by the Committee, except to the extent
that the plan prescribes or the Committee
directs how such assets shall be invested.

ERISA requires that a trustee hold plan assets in trust for
plan participants. 29 U.S.C. § 1103(a). A trustee has
"exclusive authority and discretion to manage and control the
assets of the plan" subject to two exceptions. *Id*. The first
exception is that a plan may "expressly provide[] that the
trustee or trustees are subject to the direction of a named
fiduciary who is not a trustee." *Id.* § 1103(a)(1). Under this
exception, a named fiduciary with the power to direct trustees
is a fiduciary with authority to manage plan assets. The
second exception is that an "investment manager," duly
licensed as an investment adviser under federal or state law,
may also be appointed to manage plan assets in lieu of the
trustee. *Id.* §§ 1002(38)(B), 1103(a)(2).

There is no question that Amgen appointed a trustee.
However, nothing in the record indicates that Amgen
appointed an investment manager. Neither ERISA nor the
Plan requires that an investment manager be appointed. Even
if Amgen had appointed an investment manager, the Plan
makes clear that the trustee and any investment manager do
not have complete control over investment decisions. *See*
29 U.S.C. § 1002(21)(A)(i) (defining a person with "*any*
authority or control" over plan assets to be a fiduciary)
(emphasis added); *cf. Gelardi v. Pertec Comp. Corp.*,
761 F.2d 1323, 1325 (9th Cir. 1985) (finding delegation
where defendant "retained *no* discretionary control")
(emphasis added), *overruled on other grounds in Cyr v.
Reliance Standard Life Ins. Co.*, 642 F.3d 1202, 1207 (9th
Cir. 2011).

Section 15.1 of the Plan, which authorizes the Fiduciary Committee to take action on behalf of Amgen, does not preclude fiduciary status for Amgen. In *Madden v. ITT Long Term Disability Plan for Salaried Empl.*, 914 F.2d 1279, 1284 (9th Cir. 1990), we held that the company had delegated authority to an administration committee where the plan provided that the Committee had "'responsibility for carrying out all phases of the administration of the Plan'" and had the "'exclusive right . . . to interpret the Plan and to decide any and all matters arising hereunder.'" (emphasis omitted). This language contains two features absent from the language in the Amgen Plan. First, it delegates responsibility for all phases of administering the plan, rather than responsibility "to the extent that the Plan requires an action . . . to be taken by the Company." Second, and more important, it provides the Committee the exclusive right to make decisions under the plan. The Amgen Plan merely authorizes the Fiduciary Committee to act on behalf of Amgen. It neither provides exclusive authority to the Committee, nor precludes Amgen from acting on its own behalf.

Other courts have found a company's grant of exclusive authority to a delegate and an express disclaimer of authority to be critical. In *Maher v. Massachusetts General Hospital Long Term Disability Plan*, 665 F.3d 289 (1st Cir. 2011), the First Circuit held that a hospital had delegated its fiduciary duties when the plan stated, "'The Hospital shall be fully protected in acting upon the advice of any such agent . . . and shall not be liable for any act or omission of any such agent, the Hospital's only duty being to use reasonable care in the selection of any such agent.'" *Id.* at 292. In *Costantino v. Washington Post Multi-Option Benefits Plan*, 404 F. Supp. 2d 31 (D.D.C. 2005), the district court for the District of Columbia found delegation when the plan granted the plan

administrator "'sole and absolute discretion'" to carry out various Plan duties. *Id.* at 39 n.8. Given that ERISA allows fiduciaries to have overlapping responsibilities under a plan, a clear grant of exclusive authority is necessary for proper delegation by a fiduciary. *See* 29 U.S.C. § 1102(a)(1) ("[O]ne or more named fiduciaries . . . jointly or severally . . . have authority to control and manage the operation and administration of the plan"); *see also* 1 ERISA Practice and Litigation § 6:5 ("Those who wish to avoid liability exposure through allocation of plan responsibilities to others must therefore take pains to ensure that their documents fully authorize the contemplated delegation.").

Because the Plan contains no clear delegation of exclusive authority, we reverse the district court's dismissal of Amgen from the case as a non-fiduciary.

## Conclusion

We conclude that defendants are not entitled to a presumption of prudence under *Quan*, that plaintiffs have stated claims under ERISA in Counts II through VI, and that Amgen is a properly named fiduciary under the Amgen Plan. We therefore reverse the decision of the district court and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**